UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/3/09

------------------------------------X

DANIEL KIRK and LINDA KIRK,

                Plaintiffs,           05 Civ. 9977

    -against-                     OPINION

JOSEPH M. HEPPT, ESQ.

                Defendant.

------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiffs

        JONATHAN A. WILLENS LLC
        217 Broadway, Suite 707
        New York, NY  10007
        By:  Jonathan A. Willens, Esq.

        Attorneys for Defendant

        HARTMAN & CRAVEN LLP
        488 Madison Avenue, 16th Floor
        New York, NY  10022
        By:  Donald Rosenthal, Esq.

**Sweet, D.J.**

Defendant Joseph M. Heppt ("Heppt" or the "Defendant") has moved under Rule 56, Fed. R. Civ. P., for summary judgment dismissing the complaint of plaintiffs Daniel Kirk ("Kirk") and Linda Kirk (collectively, the "Plaintiffs" or the "Kirks") and granting his counterclaim for accrued legal fees and expenses.  Upon the facts and conclusions set forth below, Heppt's motion is granted in part and denied in part.

## I.  PRIOR PROCEEDINGS

The Kirks, pro se, filed their complaint against Heppt, Kirk's former attorney, on November 28, 2005, alleging claims for, inter alia, breach of contract, fraudulent misrepresentation, and breach of fiduciary duty arising out of Heppt's representation of Kirk in an action brought by Kirk against his former employer.  On December 23, 2005, Heppt filed an Answer with Counterclaims, amended on April 20, 2007, alleging breach of contract, account stated, and defamation.

1

After the resolution of discovery disputes,
Heppt's motion to dismiss and the Kirks' cross-motion to
dismiss were granted in part and denied in part by an
opinion dated January 9, 2008.  Kirk v. Heppt, 532 F. Supp.
2d 586 (S.D.N.Y. 2008) ("January 9 Opinion").  On February
7, 2008, the Kirks filed an Amended Complaint,[1] and on March
3, 2008, Heppt filed his Answer to the Amended Complaint
and Amended Counterclaims.

The instant motion for summary judgment was heard
and marked fully submitted on October 1, 2008.

## II.  THE FACTS

The facts are set forth in the Defendant's
Statement of Undisputed Material Facts Pursuant to Local
Civil Rule 56.1 and Plaintiffs' Response and are not in
dispute except as noted below.

### A.    Kirk's Demotion

---

[1] On January 21, 2008, a Notice of Appearance was filed on behalf of the
Kirks who are no longer proceeding pro se.

By the summer of 2003, Kirk had worked for Millar
Elevator ("Millar") and/or its successor, Schindler
Elevator Corp. ("Schindler" or the "Company"), for 25
years, rising to the position of Regional Modernization
Manager for New York City and Long Island.  That summer,
Kirk began hearing rumors that his job was in jeopardy and,
in mid-July, he noticed that he had been listed in the new
company directory as a field superintendent, a non-
managerial position.  When his supervisor confirmed that
Kirk had indeed been demoted, and that others in the
company had learned of the demotion before Kirk, Kirk
became extremely upset and asked to take a three-week
vacation.  Two days after starting his vacation, he began
sending his resume to friends in the industry.

On July 21, 2003, and July 22, 2003, Kirk spoke
with a senior executive at Schindler and was told that
although he had been demoted for performance-related
reasons, the Company continued to believe that Kirk had a
valuable contribution to make, and Kirk was asked to return
to serve in the non-managerial position being offered to
him immediately.

According to Heppt, Kirk declined the Company's offer at that time, explaining that he could not accept a non-managerial position at Schindler and would not return to work unless a management-level position was made available for him.  Heppt claims that Kirk believed he was being forced out of the Company.

According to Kirk, he did not reject the Company's offer, but rather told Schindler that he had to think about the proposal.  Kirk further claims that he did not know whether he was being forced from the Company until he met with Heppt on July 31, 2003, at which time Heppt convinced Kirk that he was being forced out and should quit.

Following his conversations with Schindler, Kirk continued to seek new employment, emailing several former colleagues who were then employed by Schindler's competitors.  Kirk met with Mark Gregorio of Transel Elevator ("Transel") and was soon offered a managerial position at Transel at a lesser salary than he had received at Schindler.

4

The timing of Kirk's acceptance of Transel's offer is disputed.  According to Heppt, Kirk accepted the position at Transel on or before August 5, 2003, when he sent an email to Heppt stating that he was scheduled to start his new job on August 21, 2003.  According to Kirk, he did not formally accept the position until shortly before he began working there on August 21, 2003.

### B.   The Initial Meeting with Heppt

On July 31, 2003, the Kirks met with Heppt for the first time.  Kirk described to Heppt the circumstances of his demotion, in particular the humiliation he had experienced when he realized that his demotion had been publicized within the Company before he himself had been told.  Kirk told Heppt that he was furious with how Schindler had handled the situation, that he had an excellent record at the Company, and that Schindler's claims of poor performance on Kirk's part were fabricated.

According to Heppt, Kirk informed him that he did not intend to return to work at Schindler, and explained that he had already spoken with several potential employers.  Heppt claims that Kirk also told him that

5

Schindler had offered severance benefits to terminated employees, particularly former employees who were let go in the wake of the integration of Millar and Schindler.

According to Kirk, although he told Heppt that he would not accept the non-managerial position that Schindler had offered, he had not yet made a final decision as to whether or not he would return to Schindler.

Heppt claims that he advised Kirk that on the basis of his description of events, Kirk had potential claims for defamation and constructive discharge.  Heppt also claims that he informed Kirk that because he was an at-will employee, the damages available would likely be limited to severance benefits, and that pursuant to the mitigation doctrine, any damages available to Kirk for lost earnings would be offset by his earnings in a new position. Kirk denies receiving Heppt's qualifications related to the constructive discharge claim and the mitigation doctrine.

According to Heppt, he also advised Kirk that if the Company was unwilling to reach an amicable resolution of Kirk's grievances, litigation would be risky and potentially quite expensive.  He claims that he told Kirk

6

that because of the riskiness of his claims, he was
unwilling to handle any such litigation on a contingency
basis and would have to be compensated on an hourly basis.
The Kirks contend that Heppt did not caution them that the
litigation would be risky, instead advising that the case
against Schindler was strong, and refusing to provide an
estimate of legal fees.

Finally, Heppt noted that Schindler might offer
Kirk a financial package in light of his many years of work
there and its evident severance policy and suggested that
they begin with a demand letter and an offer to resolve
Kirk's grievances amicably.

Following the meeting, Kirk decided to retain
Heppt and, shortly thereafter, executed an engagement
letter and returned it to Heppt.  Pursuant to that
engagement letter, Kirk agreed to pay Heppt $300 per hour
for his legal services and to reimburse Heppt for any
reasonable disbursements incurred in connection with the
engagement.

On August 5, 2003, Heppt sent a demand letter to
Schindler notifying the Company of Kirk's resignation.  In

7

the letter, Heppt recounted the circumstances surrounding
Kirk's demotion, stating that "no reasonable person in his
position could be expected to continue to work at
Schindler" and noting the "great emotional stress" caused
to Kirk by the manner in which he had been treated.  Decl.
of Joseph M. Heppt in Support of Def.'s Mot. for Summary
Judgment, Ex. 2.  Heppt also requested that Schindler open
discussions concerning appropriate compensation to Kirk,
including severance and compensation for the harm cased to
Kirk's professional reputation.  He closed the letter by
noting that "Mr. Kirk would like to resolve the matter
amicably."  Id.

     Schindler's associate general counsel responded
by letter three days later, asserting that Kirk's demotion
had been justified by his unacceptable performance as a
manager and confirming that Kirk had been asked to stay on
with the Company in another capacity.  Schindler also
firmly rejected Kirk's request for "compensation for
claimed damaged to his reputation," noting that "Schindler
has no severance policy applicable to changes in job
positions or to resignations."  Id.

8

Notwithstanding an additional exchange of letters between Heppt and Schindler's in-house counsel, at no point prior to suit did Schindler volunteer the fact that, if Kirk had asserted a claim for severance benefits, that claim would have been subject to the terms of the Company's Employee Retirement Income Security Act ("ERISA") Plan (the "Plan").

On or about August 21, 2003, Kirk started work at Transel at a salary of $105,000.  Soon after, his salary was raised to $110,000, approximately $49,000 less than he had been paid at Schindler.

## C.   **The Underlying Action**

On October 2, 2003, Kirk filed suit against Schindler in New York State Supreme Court, New York County, asserting causes of action for breach of contract and defamation and seeking a declaratory judgment that Kirk had been constructively discharged by Schindler.

In November 2003, Schindler removed the state court action to federal court on the ground that Kirk's breach of contract claim was preempted by ERISA.  At the

time, Heppt believed that proceeding in federal court offered certain advantages, namely that the fast pace of litigation there would make it more likely that Schindler would enter into settlement negotiations.

In December 2003, Kirk brought to Heppt's attention that he was unable to use his master electrician's license (the "License") at Transel because of violations incurred during his tenure at Schindler which, he explained, could not be resolved unless Schindler took responsibility for the violations.  He asked Heppt to intercede with Schindler to allow him to transfer his license to Transel.  Heppt spoke to Schindler's attorney on several occasions about the License and also wrote several letters urging Schindler to take steps to enable Kirk to have free use of the License.  Schindler's attorney claimed that there was some confusion as to the steps Schindler would be required to take in order to relieve Kirk of responsibility for the violations.  In an effort to induce Schindler to take action, Heppt threatened to add a claim for tortious interference to the pending action against Schindler if the matter was not satisfactorily resolved by the end of January 2004.

10

Despite Schindler's failure to act, such a claim was never brought.  According to Heppt, he was concerned that doing so might prejudice Kirk's other claims, and was under the impression that the issue was on its way to being resolved out of court.  Heppt claims that during discovery, Schindler advanced considerable evidence that Kirk had not performed capably and that it had thus not defamed him in demoting him or in disparaging his professional competence. In light of this evidence, Heppt contends that he made the decision not to introduce a new claim into the case that would provide an opportunity for Schindler to argue that the numerous outstanding violations charged against Kirk's License constituted further evidence of his incompetence.

According to the Kirks, Heppt never raised his concerns related to the License with them, but rather told both Kirk and Schindler that he intended to assert the claim.  The Kirks allege that had Heppt had raised his concerns, Kirk would have explained that the License was used by hundreds of Schindler employees, and therefore the violations did not reflect poorly on Kirk.

According to the Kirks, the claim was never added because Heppt missed the February 17, 2004 deadline for

11

filing amendments to the complaint.  The Kirks claim that
Heppt told Kirk that the deadline was February 27, 2004.
Rather than admit his error, the Kirks contend that Heppt
allowed them to believe that the claim had been asserted
against Schindler.  According to the Kirks, it was only
after Heppt released his case file to them in 2005 that the
Kirks discovered that the claim had never been asserted.

In March 2004, Heppt concluded that the Honorable
Sidney H. Stein, to whom the case had been assigned, was
unreceptive to Kirk's claims.  Heppt suggested to Kirk that
they seek remand of the case back to state court or, in the
alternative, that Kirk drop the severance claim and thus
eliminate the basis for federal jurisdiction.  Kirk was not
willing to drop the severance claim, and Heppt proceeded
with the remand motion.  The Kirks allege that they were
never informed that the success of the remand motion turned
on the question of whether his severance benefits were
governed by ERISA.

According to the Kirks, Heppt's purpose in
bringing the remand motion was to increase the fees that he
could charge the Kirks.

12

In response to the motion for remand, Judge Stein found that Schindler's severance practices did constitute a "plan" under ERISA, that ERISA therefore preempted Kirk's common law claim for severance benefits and that federal jurisdiction was present. Neither Judge Stein in his decision nor Schindler in its opposition contended that the motion was frivolous. The Kirks contend, however, that Judge Stein did hold that Heppt's argument was inapplicable to the Schindler plan and that the cases cited by Heppt did not support remand.

Pursuant to the schedule set by the court, Schindler moved for dismissal of each of Kirk's claims during the summer of 2004. With respect to the severance claim, Schindler argued that Kirk had failed to exhaust his administrative remedies under Schindler's Plan and thus his court action was premature, that Kirk was not entitled to severance because he had voluntarily resigned, and that Kirk did not qualify for benefits under the express terms of the Plan.

Judge Stein elected to review Kirk's claim on a de novo basis, determining that, pursuant to the Plan, benefits were available for "'eligible employees who are

13

laid off due to certain specified reasons,' including location 'closedown,' 'product line relocation' and 'lack-of-work layoff.'" Kirk v. Schindler, No. 03 Civ. 8688 (SHS), 2004 WL 1933584, at *4 (S.D.N.Y. Aug. 31, 2004). Rejecting Kirk's argument that his demotion and subsequent resignation constituted a lack-of-work discharge, Judge Stein found that Kirk had failed to advance sufficient evidence in support of his theory and dismissed Kirk's severance claim on the merits. Id. at *5. The court also dismissed Kirk's claim for vacation pay based on lack of supporting evidence. Id. at *6.

With respect to Schindler's alternative arguments for dismissal of the severance claim, Judge Stein stated: "Because Kirk's ERISA [claim] is being dismissed because there is no genuine issue of material fact, this Court need not reach the issues of whether Kirk's claim should also be barred because he failed to exhaust administrative remedies or whether Kirk's resignation should be deemed the result of constructive discharge." Id. at *6 n.1. The court then declined to exercise supplemental jurisdiction over Kirk's remaining New York law claims and dismissed them without prejudice. Id. at *6.

14

On September 16, 2004, Heppt met with the Kirks
to discuss the court's decision and advised them that he
did not see a basis for a successful appeal.  When Kirk
complained about certain of the factual statements in the
decision, Heppt contends that he advised him that a motion
to address those errors would likely be dismissed because
any errors were not material to the court's analysis.  The
Kirks indicated that they intended to consider their
options and Heppt offered to be of assistance, noting that
his engagement was now terminated.  Kirk did not ask Heppt
to file a new state court action and Heppt did not offer.

According to the Kirks, Heppt agreed that they
should write a letter to the Court addressing the errors,
but never stated that his engagement was terminated.

Kirk then wrote directly to Judge Stein
concerning the alleged factual mistakes in the court's
decision.  Judge Stein treated Kirk's application as a Rule
60(b) motion and denied it on November 29, 2004.  Kirk v.
Schindler Elevator Corp., No. 03 Civ. 8688 (SHS), 2004 WL
2726001 (S.D.N.Y. Nov. 29, 2004).  Kirk did not appeal the
dismissal.

15

D.   **The Hiring of Elizabeth Hill**

In January 2004, Heppt hired a contract attorney,
Elizabeth Hill ("Hill"), to assist him with Kirk's case.
Hill's time was listed on Heppt's invoices beginning with
an invoice dated January 31, 2004, identifiable by the use
of her initials in the "lawyer" column.  According to the
Kirks, they did not know that Heppt had been charging them
for Hill's time beginning in January and dispute that
Hill's time was readily identifiable.  According to the
Kirks, Heppt did not obtain their consent to Hill's
participation until three months after she began working on
the case.  The Kirks further allege that they never
formally agreed to pay Heppt for Hill's services.

The parties do agree that on March 30, 2004,
Heppt told the Kirks that he needed assistance with ERISA-
related issues and wished to bring Hill aboard for that
reason.  At that time, the Kirks lodged no objection to
Hill's work on the case.

The Kirks contend that Hill was hired to handle
discovery-related matters so that Heppt could work on other
cases while earning a profit of $125 per hour for Hill's

16

work on Kirk's case.  The Kirks also allege that Hill did
not work on ERISA matters until late March 2004, and that
although Heppt told them that Hill was "an accomplished
ERISA lawyer," Hill had only recently completed her
advanced degree, an L.L.M., in labor law and did not have
any significant practical experience.

According to the Kirks, Heppt "grossly
overcharged" them for Hill's work and charged for work
performed by Hill for which she was not paid by Heppt.
According to Heppt, all of Hill's invoices to Heppt have
been produced and there is no evidence of any such
fabricated charges.  Heppt asserts that he reduced some of
Hill's time charges when invoicing Kirk.

According to the Kirks, Hill's records indicate
that she was paid in full by Heppt in the amount of
$6,537.50, while Heppt charged Kirk over $27,000 for her
time and contracted with Hill to pay her $125 for each
hour, while he billed Kirk $250 per hour for the same work.
According to the Kirks, Hill worked approximately 50 hours
on the case, while Heppt billed the Kirks for approximately
108 hours.  According to Heppt, the amount paid to Hill was
$9,500.

17

A substantial portion of the legal time spent by Heppt and Hill on Kirk's case was devoted to discovery. In that regard, Heppt took five depositions and defended one deposition.  In addition, he obtained three witness statements from former Schindler employees.  He and Hill also obtained and reviewed some 3,300 pages of documents produced by Schindler.  In total, Heppt devoted not less than 48 hours to discovery-related activities and Hill devoted over 31 hours to discovery, representing approximately $22,000 in legal fees.

Heppt claims that during this process, the Kirks praised Heppt's persistence and effectiveness on several occasions.  The Kirks now claim, however, that much of this discovery was irrelevant and wasteful, and that the hours spent on discovery were out of proportion to any potential recovery on the defamation or constructive discharge claims asserted in the underlying case.

Beginning on September 2, 2003, and ending on September 30, 2004, Heppt sent Kirk a total of 13 invoices. According to the Kirks, there is no invoice dated September 3, 2004, and the invoices do not include a second invoice

18

dated July 31, 2004, showing total fees and disbursements
of $16,626.27, which was later withdrawn by Heppt as
inaccurate.  The Kirks made a total of ten payments to
Heppt.

Beginning in April 2004, Heppt agreed that Kirk
did not have to pay his entire balance each month so long
as he made regular payments against the bill.  However,
when Kirk eventually disputed Heppt's fees, Heppt responded
by demanding payment of the entire balance of $51,985.84.

On October 12, 2004, Kirk sent a letter to Heppt
in which he complained about Heppt's representation and
accused Heppt, inter alia, of failing to notify him
promptly of Judge Stein's summary judgment decision,
overcharging for his work, inappropriately relying on
Hill's work, and failing to marshal sufficient evidence to
prove Kirk's case.

Following the disposition of a non-binding fee
arbitration between Kirk and Heppt in 2005, Kirk accused
the arbitrators of bias and sought to re-open the
proceedings.  That application was denied by the New York
County Lawyers Association.

**E.   Subsequent Actions**

In January 2006, the Kirks sued Schindler pro se in state court, alleging tortious interference for refusing to remove the violations against the License and intentional infliction of emotional distress.  Kirk has attributed the 16-month delay from the time of the dismissal of his federal court action to the commencement of his state court action to his efforts to obtain his case file from Heppt.  According to the Kirks, they believed that they needed Heppt's file to determine whether the claim relating to the License had been addressed in the federal court action.

At a March 20, 2006 hearing, the presiding judge, Justice Jane Solomon, instructed her law secretary to find out what steps had to be taken by Schindler to permit Kirk to use his License at Transel.  Schindler agreed to take those steps, which required payment of outstanding fines and submission of a letter taking responsibility for the violations filed against Kirk's License.  According to the Kirks, Kirk was able to successfully transfer his License to Transel in November 2006.

20

On August 7, 2006, Justice Solomon granted
Schindler's motion to dismiss the action.  The Kirks' cause
of actions for defamation and intentional infliction of
emotional distress were determined to be time barred.  As
to the Kirks' allegation that Schindler tortiously
interfered with Kirk's business relations by interfering
with his ability to transfer his License to his new
employer, the court concluded that Kirk had alleged "no
wrongful conduct by Schindler directed at a third party,"
and accordingly dismissed the complaint.  See Decl. of
Donald Rosenthal in Support of Def.'s Mot. for Summ. J.,
Ex. 11.  The Kirks appealed the ruling and the Appellate
Division subsequently affirmed.  Kirk v. Schindler Elevator
Corp., 854 N.Y.S.2d 4 (App. Div. 2008).

In addition to the pro se state court action,
Kirk has brought at least two other actions against
Schindler.  Kirk filed an administrative complaint against
the Company with the Department of Labor under the Vietnam
Era Veterans Readjustment Assistance Act ("VEVRAA"), 38
U.S.C. § 4212, a statute designed to prevent discrimination
against Vietnam War veterans.  That complaint was

21

ultimately dismissed by the Department of Labor, but,
according to the Kirks, is currently pending on appeal.

In addition, Kirk filed a qui tam action against
Schindler, alleging claims under the qui tam provisions of
the False Claims Act, 31 U.S.C. § 3729—33.  In that action,
Kirk alleged that Schindler filed false certifications with
respect to its compliance with VEVRAA.  That action was
dismissed on March 30, 2009, U.S. ex rel. Kirk v. Schindler
Elevator Corp., 606 F. Supp. 2d 448 (S.D.N.Y. 2009), and
has also been appealed.

## III.   THE SUMMARY JUDGMENT STANDARD

Summary judgment is granted only if there is no
genuine issue of material fact and the moving party is
entitled to judgment as a matter of law.  Fed. R. Civ. P.
56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23
(1986); SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329,
338 (2d Cir. 2004).  The courts do not try issues of fact
on a motion for summary judgment, but, rather, determine
"whether the evidence presents a sufficient disagreement to
require submission to a jury or whether it is so one-sided

22

that one party must prevail as a matter of law." <u>Anderson</u>
<u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986).

For the purposes of summary judgment, "[a] fact
is 'material' . . . if it 'might affect the outcome of the
suit under the governing law' . . . [and an] issue of fact
is 'genuine' if 'the evidence is such that a reasonable
jury could return a verdict for the nonmoving party.'"
<u>Holtz v. Rockefeller & Co., Inc.</u>, 258 F.3d 62, 69 (2d Cir.
2001) (quoting <u>Anderson</u>, 477 U.S. at 248).  The moving
party has the initial burden of showing that there are no
material facts in dispute, <u>Adickes v. S.H. Kress & Co.</u>, 398
U.S. 144, 157 (1970), and can discharge this burden by
demonstrating that there is an absence of evidence to
support the nonmoving party's case.  <u>Celotex</u>, 477 U.S. at
325.  The nonmoving party then must come forward with
"specific facts showing that there is a genuine issue for
trial," Fed. R. Civ. P. 56(e), as to every element
"essential to that party's case, and on which that party
will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S.
at 322.

In determining whether a genuine issue of
material fact exists, a court must resolve all ambiguities

23

and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002).  However, "the non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful."  Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quotation and citation omitted).


## III.   HEPPT'S MOTION FOR SUMMARY JUDGMENT IS DENIED

### A. There Is Proximate Cause Arising Out of the Alleged Malpractice

To establish legal malpractice under New York law,[2] a plaintiff must show:  "(1) a duty, (2) a breach of the duty, and (3) proof that actual damages were proximately caused by the breach of the duty."  Tinelli v. Redl, 199 F.3d 603, 606 (2d Cir. 1999) (quotations and citation omitted).  On a motion for summary judgment, the "defendant may prevail by demonstrating the plaintiff's inability to prove one of the three elements."  Iannazzo v.

---

[2] The parties here do not dispute the applicability of New York law.

24

Day Pitney LLP, No. 04 Civ. 7413 (DC), 2007 WL 2020052, at *5 (S.D.N.Y. July 10, 2007) (citing Carney v. Philippone, 332 F.3d 163, 167 (2d Cir. 2003)).

The duty element requires the plaintiff to demonstrate "the standard of professional care in the legal community." Id. at *6. To establish the second of the two elements, a plaintiff must show that the attorney "fail[ed] to exercise that degree of care, skill and diligence commonly possessed and exercised by a member of the legal community." Nobile v. Schwartz, 265 F. Supp. 2d 282, 288 (S.D.N.Y. 2003) (quotations and citation omitted). A mere error in judgment is not enough to satisfy an attorney's duty to her client. "[A]n attorney may take chances, and if in such cases a lawyer errs on a question not elementary or conclusively settled by authority, that error is one of judgment for which he is not liable." Littman Krooks Roth & Ball P.C. v. N.J. Sports Prods., Inc., No. 00 Civ. 9419 (NRB), 2001 WL 963949, at *3 (S.D.N.Y. Aug. 22, 2001) (quotations and citation omitted). Indeed, attorneys "are not guarantors of a favorable outcome in litigation, and their reasonable strategic decisions made in the course of representing a client do not amount to malpractice."

25

Iannazzo, 2007 WL 2020052, at *6 (internal quotations and citation omitted).

With respect to proximate causation, a plaintiff "must show that but for the attorney's negligence, he or she would have prevailed in the underlying action or would not have sustained any damages." Nobile, 265 F. Supp. 2d at 289. The causation requirement is a "high bar to attorney malpractice liability" and "seeks to insure a tight causal relationship exists between the claimed injuries and the alleged malpractice." Flutie Bros. LLC v. Hayes, No. 04 Civ. 4187 (DAB), 2006 WL 1379594, at *5 (S.D.N.Y. May 18, 2006) (internal quotations and citation omitted). "[T]o establish the elements of proximate cause and actual damages, where the injury is the value of the claim lost, the client must meet the 'case within a case' requirement, demonstrating that 'but for' the attorney's conduct the client would have prevailed in the underlying matter or would not have sustained any ascertainable damages." Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc., 780 N.Y.S.2d 593, 596 (App. Div. 2004); see Littman Krooks Roth & Ball, P.C., 2001 WL 963949,

26

at *3 (holding that proximate causation "requires the
trier of fact . . . [to] decide a lawsuit within a
lawsuit, because it demands a hypothetical re-
examination of the events at issue absent the alleged
malpractice." (internal quotations and citation
omitted)).  Heppt challenges the Kirks' ability to
establish only the third element of proximate cause in
the instant motion.

Plaintiffs make two separate allegations in
support of their first cause of action for legal
malpractice.  First, Heppt is alleged to have advised Kirk
to resign his position at Schindler following his demotion
resulting in the waiver of his ERISA claim.  Second, the
Kirks allege that Heppt failed to assert a claim against
Schindler to clear Kirk's License despite his assurances
that he would do so.

As to Heppt's advice regarding Kirk's employment
at Schindler and its effect on the underlying lawsuit, the
Kirks contend that at the July 31, 2003 meeting, Heppt
advised Kirk to resign:

> At the meeting on July 31, 2003, my husband told
> Mr. Heppt that the former Executive Vice
> President of Millar, Anthony Santiago, was

27

terminated and given severance just prior to the
integration but he did not know the amount
received. Mr. Heppt responded that mergers and
integrations such as the Millar/Schindler
integration often necessitate reductions in force
and that Schindler's disgraceful handling of the
demotion was proof my husband was no longer
needed by the company. Although my husband had
made no decision to leave Schindler before
meeting with Mr. Heppt, he was convinced by this
statement that he could not return to Schindler.

The next question was what to do when his three-
week vacation ended on August 5, 2003. We
discussed the option of staying home until
Schindler terminated my husband for failing to
come to work. In fact, at the July 31 meeting, my
husband specifically asked Mr. Heppt if he should
sit home and wait to be fired. Mr. Heppt
confidently said, "No, you quit."

Decl. of Linda Kirk in Opp. to Def.'s Mot. for Summ.

J., at ¶¶ 13-14.  According to Kirk, he relied on

Heppt's advice in deciding to resign from Schindler

despite the fact that at the time Heppt advised Kirk

to resign, Heppt had not read Schindler's Plan, was

unfamiliar with ERISA, and did not even inquire into

whether Kirk's resignation would impact his claims

under the Plan.


     For purposes of this motion, Heppt does not

dispute that his conduct with respect to the Plan was

negligent, instead arguing that the Kirks cannot

establish proximate causation in connection with the

28

advice because Judge Stein's decision denying Kirk's
severance benefits claim was not based on Kirk's
resignation.  Since the Kirks cannot establish that
they would have been able to recover the value of
their claim had Kirk not resigned, Heppt contends that
the "case within a case requirement" bars recovery.

However, Heppt mischaracterizes the relevant
proximate cause inquiry here, focusing on the
connection between his advice and the outcome of the
underlying action.  Because Heppt's negligence is
alleged to have waived Kirk's claim for severance
under the Plan before Schindler had any opportunity to
consider it and before any suit was filed, the proper
analysis focuses on whether Heppt's negligence was one
of the proximate causes of Kirk's lost severance
benefits more broadly.  To prove proximate causation
in this context, the Kirks need not show that Heppt's
negligence was the sole cause of Kirk's lost severance
benefits.  See Skinner v. Stone, Raskin & Israel, 724
F.2d 264, 266 (2d Cir. 1983) ("It is well-settled law
in New York, that, when there are several proximate or
efficient causes of an injury, the injury may be
attributed to any one or more of the causes.").

29

Rather, the Kirks can demonstrate proximate causation
by showing that Heppt's failure to determine whether
Kirk was eligible for benefits under ERISA before
advising him to resign was one of the causes of Kirk's
failure to recover severance benefits from Schindler,
notwithstanding Judge Stein's eventual dismissal.
Despite Heppt's assertion that Judge Stein's opinion
finding that Kirk's demotion was not covered by the
plan's "lack of work" provision precludes proximate
cause, a jury could reasonably find that Heppt also
contributed to Kirk's failure to recover any severance
benefits from Schindler by rendering negligent advice
and failing to file a claim under ERISA before filing
suit in state court.  See, e.g., Garten v. Shearman &
Sterling LLP, 859 N.Y.S.2d 80, 82 (App. Div. 2008)
("Neither the borrower's failure to repay the loan nor
the senior creditors' eventual failure to act
honorably . . . relieves defendant of potential
liability for its negligence."); Barnett v. Schwartz,
848 N.Y.S.2d 663, 668 (App. Div. 2007) ("In the main,
the cases from the Court of Appeals . . . do not
expressly require that the negligence be either 'the'
or 'a' proximate cause of damages, but require proof
that, 'but for' the negligence of the defendant-

attorney, the plaintiff-client would . . . not have
incurred damages (in an action alleging negligent
advice, etc.).").

    Defendant cites several cases in support of his
argument that because Judge Stein did not rely on Kirk's
resignation in his dismissal of Kirk's severance claim, any
advice relating to the dismissal could not be the proximate
cause of Kirk's loss of severance benefits.  For example,
in Flutie Bros. v. Hayes, the court dismissed a legal
malpractice claim under Rule 12(b)(6) because "[t]he type
of evidence Plaintiff contends that [the defendant] should
have obtained, and the information he could have gleaned
from the depositions he should have taken, would not have
changed the [] Court's determinations" in the underlying
action.  2006 WL 1379594, at *6; see also Nazzaro v.
Balber, 05 Civ. 2172 (CSH), 2005 WL 2290205 (S.D.N.Y. 2005)
(dismissing case on proximate cause grounds where client
alleged malpractice based on the lawyer's failure to assert
specific claims in the underlying case but court found that
claims were rejected or would have been rejected if they
had been raised).

As described above, the fact that Kirk's
severance claim was dismissed on the merits for reasons
other than his resignation does not preclude the
possibility that Heppt's allegedly negligent advice was the
proximate cause of the Kirks' lost benefits.  The Kirks do
not allege that the outcome of their federal case against
Schindler would have been different had Heppt rendered
different advice.  Rather, Plaintiffs' base their legal
malpractice claim on the premise that had Heppt offered
non-negligent advice, namely that Kirk not immediately
resign his position, Kirk would have been awarded severance
benefits under his ERISA Plan.  Because an issue of
material fact exists as to whether or not such benefits
would have been awarded to Kirk, summary judgment on
Plaintiffs' first cause of action cannot be granted.

Heppt also has challenged the proximate cause
element of the Kirks' second legal malpractice claim which
contends that Heppt ignored Kirk's instructions and failed
to bring a claim against Schindler to reinstate his
License.  Heppt first argues that the Kirks cannot
establish proximate cause with respect to the License
because any causative nexus between Heppt's failure to
assert such a claim was severed by the Kirks' subsequent

32

state court claim for tortious interference.  However,
Heppt again mischaracterizes the Kirks' claim.  The Kirks
do not contend that Kirk asked Heppt to bring a tortious
interference claim against Schindler for damages in 2004,
but rather asked Heppt to assert any claim that would bring
the Company's misconduct to the court's attention and cause
Schindler to take the necessary steps to transfer the
License.  Since the Kirks do not contend that Heppt was
negligent in failing to bring a tortious inference claim,
the disposition of the claim in state court does not defeat
proximate cause.

According to Plaintiffs, the relief sought by
Kirk at the time Heppt is alleged to have negligently
failed to assert the claim was an order compelling the
transfer of the License.  Assuming Heppt was in fact
negligent, he became liable for any injury his negligence
caused, and it is for a jury to determine whether Kirk
suffered a $77,000 loss in salary as a result of the delay
of the License transfer.  See Fishkill Health Related Ctr.,
Inc. v. Van DeWater & Van DeWater, 651 N.Y.S.2d 986 (App.
Div. 1997) (reversing summary judgment for defendants where
lawyer failed to advise plaintiffs of availability of
injunction which could have prevented loss of lease).

33

Finally, Heppt contends that his negligence was not the proximate cause of any harm related to the License because even if a claim had been raised in the underlying action, the court would have dismissed it, as it did the other state claims, for lack of federal jurisdiction. Since the court exercised jurisdiction over Kirk's state law claims until its dismissal of the benefits claim in October 2004, whether or not Judge Stein would have attempted to facilitate the transfer of the License had the issue been raised in early 2004 as requested, and as subsequently done by Justice Solomon, is a question of fact for the jury. See Phillips v. Moran & Kufta, P.C., 862 N.Y.S.2d 875, 876 (App. Div. 2008) (denying summary judgment where defendant raised issue of fact in connection with what relief would have been available in underlying action).

Because there is "conflicting evidence concerning . . . whether any negligence on [the attorney's] part was the proximate cause of plaintiff's loss," Kenney v. Zimmerman, 586 N.Y.S.2d 80, 81 (App. Div. 1992), Heppt's motion for summary judgment with respect to the Kirks' first cause of action is denied.

34

**B. The Elements of the Cause of Action for
Breach of Fiduciary Have Not Been Established**

In its January 9, 2008 Opinion, this Court stated
that in order to prevail on a cause of action for breach of
fiduciary duty in New York, a plaintiff must prove only two
elements:  (1) the existence of a fiduciary duty between
the parties and (2) the breach of that duty by defendant.
See January 9, 2008 Opinion at 592.  In holding that the
Kirks were not required to allege causation, the Court
relied on cases from this District, see Official Comm. of
Asbestos Claimants of G-1 Holding, Inc. v. Heyman, 277 B.R.
20, 37 (S.D.N.Y. 2002) ("Under New York law, the elements
of a claim for breach of fiduciary duty are (1) existence
of fiduciary relationship and (2) breach of a fiduciary
duty."); Schweizer v. Mulvehill, 93 F. Supp. 2d 376, 401
(S.D.N.Y. 2000) ("[A] breach of fiduciary duty may give
rise to liability in the absence of damages."), as well as
a New York Supreme Court case, Ulico Cas. Co. v. Wilson,
Elser, Moskowitz, Edelman & Dicker, et al., 843 N.Y.S.2d
749 (Sup. Ct. 2007).

35

In Ulico, the New York Supreme Court, New York County, held that unless a legal malpractice claim and a breach of fiduciary duty claim are "co-extensive," "no proof of damages is required where the remedy that is sought for the breach is forfeiture of compensation." Id. The First Department recently addressed the lower court's application of that "considerably lower standard of recovery" in the breach of fiduciary duty context, clarifying "that to recover under a claim for damages against an attorney arising out of the breach of the attorney's fiduciary duty, the plaintiff must establish the 'but for' element of malpractice, irrespective of how the claim is denominated in the complaint." Ulico Cas. Co. v. Wilson, Elser, Mosokowitz, Edelman & Dicker, 865 N.Y.S.2d 14, 22 (App. Div. 2008).

The Kirks have contended that, under the law of the case doctrine, this Court is bound by its prior holding that proximate cause is not an element of Plaintiffs' second cause of action. "Under the law of the case doctrine, a decision on an issue of law becomes binding precedent in subsequent stages of the same litigation." Brentwood Pain & Rehabilitation Servs., P.C. v. Allstate Ins. Co., 508 F. Supp. 2d 278, 288 (S.D.N.Y. 2007)

36

(citation omitted).  The doctrine is discretionary and reconsideration is authorized under certain circumstances, including "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) (quotations and citation omitted).  To the extent the Court's previous articulation of the law was made prior the First Department's decision in Ulico, the Court now holds that the Kirks are required to prove causation in order to succeed on their breach of fiduciary duty claim.

The Kirks make the following allegations with respect to their breach of fiduciary duty cause of action: 1) Heppt's hiring of Hill was unauthorized and resulted in inflated fees; 2) the sole purpose of the April 2004 remand motion was to increase fees; 3) Heppt produced incomplete responses to Schindler's summary judgment motion; and 4) Heppt failed to advise Kirk about the limited value of his defamation claim.

With respect to Plaintiffs' claim concerning Hill, the Kirks contend that Heppt associated himself with

37

Hill without fully disclosing to the Kirks the role that she would play in the Schindler litigation or the hourly rate that they would be charged for her time and without obtaining Plaintiffs' informed consent to her participation.  Further, they claim that Heppt overstated the time spent by Hill on the Schindler action and overcharged the Kirks for her work and misstated Hill's qualifications.

Assuming that such conduct on the part of Heppt constituted a breach of his fiduciary duty, the Kirks have not satisfied their burden in pointing to any injuries suffered as a result of such a breach.  Beginning in January 2004, Heppt's invoices listed Hill's time and gave a detailed description of the work that she was performing. Kirk then met Hill at Heppt's offices in March 2004, at which time Heppt informed Kirk that he wanted Hill to assist on the case, and Kirk asked Heppt about Hill's billable rate.  The Kirks never questioned or objected to Hill's participation, either when they received the invoices in January or when they met Hill in March 2004. Further, the Kirks have never contended that Hill's work fell below professional standards or that Kirk's case suffered due to some purported error on her part.  Nothing

38

in the record indicates that Hill did not work diligently and competently on the underlying action, and the Kirks have failed to identify any specific mistake or substandard conduct on her part.  See Madison Hudson Assocs. LLC v. Neumann, 843 N.Y.S.2d 589, 598 (App. Div. 2007) (holding that in the absence of any factual showing of injury, plaintiff's breach of fiduciary duty claim was properly dismissed) (citing Kurtzman v. Bergstol, 835 N.Y.S.2d 644 (App. Div. 2007)); see also Gibbs v. Breed, Abbott & Morgan, 710 N.Y.S.2d 578 (App. Div. 2000).

With respect to their allegations that Heppt inflated the time spent by Hill on the underlying action, Plaintiffs have not produced any evidence, other than speculation, to prove that such inflation actually occurred.  Similarly, to the extent they argue that Heppt inaccurately stated that Hill was an "accomplished ERISA lawyer" when she had only recently earned an LL.M. degree in labor law and had no appreciable practical experience with ERISA, the record again contains no evidence that the Kirks suffered any harm by virtue of Hill's alleged inexperience.

39

In connection with the remand motion filed in the underlying action, Plaintiffs allege that the motion lacked any legal basis and served no purpose other than to increase the fees that Heppt charged to Kirk.  However, the fact that Heppt's motion seeking remand to state court was unsuccessful does not demonstrate that Heppt did not act competently, nor does it indicate that Heppt failed to honor his client's interests above his own, constituting a breach of his fiduciary duties.  See Matter of Cooperman, 83 N.Y.2d 465, 472 (1994) ("The duty to deal fairly, honestly and with undivided loyalty superimposes onto the attorney-client relationship a set of special and unique duties, including . . . honoring the clients' interests over the lawyer's."); Town of North Hempstead v. Winston & Strawn, LLP, 814 N.Y.S.2d 237, 240 (App. Div. 2006) (finding that an attorney "cannot be held liable for exercising [his] professional judgment on a question of law that was not elementary or conclusively settled by authority").  While Heppt has cited several cases in support of the argument made in the remand motion, namely that ERISA did not govern Schindler's benefits program, the Kirks have not offered any evidence, other than Judge Stein's denial of the motion, in support of their contention that the motion was baseless.  Instead, the

40

point to Heppt's statements related to the financial
hardship that Kirk's failure to pay Heppt's invoices had on
his practice as evidence of Heppt's motives for inflating
his fees.  Such statements are not sufficient to establish
a breach of fiduciary duty with respect to the remand
motion and the fees associated therewith.

As to the Kirks' third claim, Plaintiffs have
again offered no evidence that their case was impaired or
that they suffered harm as a result of Heppt's decision not
to controvert every one of Schindler's factual assertions
in the underlying action.  Following Judge Stein's
dismissal, Kirk himself moved to set aside the judgment
under Rule 60(b) on the ground that the decision was based
on certain factual errors.  Judge Stein rejected Kirk's
argument, finding that none of the alleged errors was
material to his conclusions.  Accordingly, Kirk's severance
claim was not prejudiced because of any factual
misstatement and the Kirks therefore suffered no harm as a
result of any alleged breach on the part of Heppt.

The Kirks' final basis for their breach of
fiduciary duty cause of action is Heppt's failure to advise
Kirk about the limited value of his defamation claim.   In

41

support of their claim, Plaintiffs rely on the conclusory statement from their expert that "Heppt's failure to properly advise Kirk with respect to the defamation claim (and the likely recovery of his litigation overall) amounts to a breach of his fiduciary duty to Kirk."  Decl. of Jonathan A. Willens in Opp. to Def.'s Mot. for Summary Judgment, Ex. D., Report Pursuant to Fed. R. Civ. P. 26(a)(2).  This statement, without more, is insufficient as a matter of law to establish a breach of fiduciary duty.

Accordingly, Plaintiffs' second cause of action is dismissed.

### C.   <u>The Breach of Contract Claim is Dismissed</u>

For the first time in his reply to Plaintiffs' opposition to the instant motion, Heppt argues that dismissal of the Kirks' third cause of action alleging breach of contract is required.  "Under New York law, a breach of contract action may be maintained against a professional based on 'an implied promise to exercise due care in performing the services required by the contract.'" <u>Schweizer</u>, 93 F. Supp. 2d at 397 (quoting <u>Santulli v. Englert, Reilly & McHugh</u>, 78 N.Y.2d 700, 705 (1992)).

42

Where, however, the breach of contract claim is "merely

redundant of the malpractice claim," it is properly

dismissed.  Iannazzo, 2007 WL 2020052, at *11; see Diamond

v. Sokol, 468 F. Supp. 2d 626, 640–41 (S.D.N.Y. 2006)

(dismissing breach of contract claim as redundant of

malpractice claim "where it is does not 'rest upon a

promise of a particular or assured result,' but rather upon

defendant's alleged breach of professional standards."

(quoting Senise v. Mackasek, et al., 642 N.Y.S.2d 241, 242

(App. Div. 1996)).


Although the Amended Complaint alleges that the

engagement agreement between Kirk and Heppt contained "an

implied promise by Mr. Heppt to exercise due care in

performing legal services for plaintiffs," Am. Compl. ¶

104, the Kirks' breach of contract cause of action rests on

identical facts as those relied on for the malpractice

claim.  The third cause of action is therefore duplicative

and must be dismissed.


IV.  **Summary Judgment on the Account
     Stated Counterclaim Is Denied**

Heppt has also moved for summary judgment on his

counterclaim for account stated.  In light of the Kirks'

43

remaining legal malpractice claim, Defendant's motion is
denied.

In New York, summary judgment should not be
granted to an attorney on an account stated claim where the
client asserts a plausible claim for malpractice.  See
Tabner v. Drake, 780 N.Y.S.2d 85, 89—90 (App. Div. 2004)
("Because defendants have shown the existence of a triable
issue of fact with respect to a bona fide defense to
plaintiffs' claims to legal fees, it is premature to grant
plaintiffs summary judgment on their account stated cause
of action." (citations omitted)).

Because Heppt does not dispute that the Kirks'
alleged malpractice claim provides them with a defense to
his account stated counterclaim, Heppt's motion is denied.

**V.    CONCLUSION**

Based on the facts and conclusions set forth
above, Heppt's motion is granted in part and denied in
part.

It is so ordered.

44

New York, NY
September      , 2009

ROBERT W. SWEET
U.S.D.J.